375 A.2d 750

**Norman E. RICHARDS**

v.

**DRAVO CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 12, 1976.

Decided June 29, 1977.

48

Bruce R. Martin, Pittsburgh, for appellant.

Thomas Hollander, Pittsburgh, for appellee.

Before JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

Appellee Norman Richards brought a personal injury action against appellant Dravo Corporation, for damages sustained as a result of an injury appellee claimed to have received during the course of his employment on appellant's dredge Number Sixteen on the Ohio River. Following a jury trial, two verdicts were entered; one for $60,000.00 in favor of plaintiff-appellee, and one for $10,763.29 in favor of appellant, representing a counterclaim for payments already made to appellee at time of trial.

Several allegations of error are made on appeal, focusing primarily on the charge to the jury, an apparent molding of the verdict, and arguments that the verdict was excessive and against the weight of the evidence. While we agree with the allegation that certain errors were committed at trial, we believe that those errors were either corrected by the trial court, or were not of sufficient magnitude to require a new trial; hence we affirm.

This action was brought pursuant to the Merchant Marine Act of 1920, § 33, 41 Stat. 1007, 46 U.S.C.A. § 688 (1975), commonly called the Jones Act.[1] It is established that the courts of this Commonwealth have concurrent jurisdiction with federal courts to try actions brought under the Jones Act for injuries sustained, and for maintenance and cure under traditional maritime law. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1943); *Rankin v. Iron City Sand and Gravel Corporation*, 356 Pa. 548, 52 A.2d 455 (1947).

Appellant's first assertion of error is that the trial court permitted duplication of damages. We do not agree. At trial, plaintiff was permitted to place into evidence certain items of damages such as lost wages and medical expenses, even though portions of those items had already

1. In addition to preserving the seaman's traditional maritime rights to receive maintenance and cure and sue for damages resulting from unseaworthiness, the Jones Act extends the rights of seamen to sue for injuries resulting from the shipowner's negligence. The Act provides that rules of liability established under the Federal Employers' Liability Act will apply in such an action.

been paid by defendant pursuant to the long standing obligation of the ship's owner to provide "maintenance, cure, and wages" to a seaman injured or taken ill while in service of the ship, without regard to the question of fault. "Maintenance" is a payment intended to provide food and lodging for the seaman while he is recovering from the injuries or illness, while "cure" is a payment to cover medical expenses incurred until such time as the seaman has reached the maximum medical recovery thought possible. Benedict on Admiralty, Vol. IB, § 51 (7th ed. 1976). The right to maintenance, cure, and wages arises out of an implied contractual obligation, and is separate and independent from the right to receive compensatory damages in a negligence or unseaworthiness action. *Pacific S.S. Co. v. Peterson*, 278 U.S. 130, 49 S.Ct. 75, 73 L.Ed. 220 (1928). While these rights are separate, and not mutually exclusive, there is a certain degree of overlap:

> "It is obvious on principle that a plaintiff who has recovered medical expenses, a living allowance or unearned wages under the name of maintenance and cure has no right to recover them a second time in a damage action. Thus any maintenance and cure expenses which have been recovered as damages ought to be subtracted from a maintenance and cure award and vice versa." Gilmore & Black, The Law of Admiralty, §§ 6–9, p. 261 (1957).

Clearly, a seaman's right to bring an action for damages, in addition to receiving maintenance and cure, does not entitle him to double recovery for any given element of damage. *Crooks v. United States*, 459 F.2d 631 (9th Cir. 1972). In the case at bar, appellee was permitted to include in his damage claim, medical expenses and lost wages that in fact had already been paid by appellant. The amount already paid by appellant was stipulated at trial to be $10,763.29. This amount was entered as a verdict in favor of appellant, as a set-off against appellee's total damage award. Since the amount paid under the maintenance and cure obligation will ultimately be subtracted from the total damage award, we fail to see any merit in appellant's claim that duplication of damages was permitted.

Appellant makes several claims of error with respect to the trial court's supplemental charge on causation and duty.[2] The relevant portion of the charge appears below:

"Defendant is under a duty to provide his employees with a reasonably safe place within which to work, reasonably safe tools and appliances with which to work, and a reasonably safe method in which to work.

"You may find that the injury to Mr. Richards was caused by the peculiar working conditions under which the men were ordered to perform. If I haven't told you that already, you may so find. Even though it is argued that it was apparently usual and customary to perform the work in the manner described you may find that the working conditions involved an unreasonable risk of harm to Mr. Richards. You may find that the Defendant failed to furnish adequate assistance to him in either of the things that he did. *You may find the Defendant liable to the Plaintiff if you find there was a safer method to repair the harp that was talked about than the method used; and if the safer method were used, he would not have been injured.*

"If I haven't expressed this in the right way, here is what I want you to remember about this aspect of the case: *When the Defendant's foreman gave him working assignments, he had the right to assume that he would not thereby be exposed or subjected to injury. If there were a number of causes of injury to the Plaintiff, that is irrelevant as long as you determine there is one cause which may be attributable to the Defendant's negligence.*" Printed Record at 356a–357a (emphasis added).

Appellant has extracted the underlined sentences from this portion of the charge, arguing that it contained certain

2. The complained of portion of the charge was an attempt to correct an earlier charge on causation, in which the trial judge instructed the jury that in order for the plaintiff to recover, they had to find that the employer's negligence was *the* proximate cause of the seaman's injury. Printed Record at 320a–322a. The proper test is whether the employer's negligence played any part, however slight, in causing the injury. *Heater v. Chesapeake and Ohio Railway Company,* 497 F.2d 1243 (7th Cir. 1974).

misstatements of the law. Even if such is the case, we must look at the charge in its entirety, not just isolated portions thereof, to determine its correctness. *See e. g. Mount v. Bulifant*, 438 Pa. 265, 265 A.2d 627 (1970). In order to properly address appellant's contentions, we will first review the circumstances which appellee claims precipitated his injuries.

Appellee was working aboard appellant's dredge on the Ohio River. On June 8, 1972, appellee and a fellow employee were assigned to replace the worn out "hammers" on appellant's gravel crushing machine located on the dredge. In the process of performing his assignment, appellee was required to lift the heavy hammers (between eighty and ninety pounds) by hand. Appellee testified that in attempting to lift one of the new hammers, he felt something "tear loose" in his back, and that the ensuing pain caused him to cry out. Printed Record at 160a. Both appellee and his co-worker testified that the platform on which they were required to work was cluttered with oil, gravel, and several sets of used hammers. The normal practice was to remove the used hammers by means of a hoist, but at the time the hoist was broken down. Appellee testified that he was standing in an awkward position when he attempted to lift the hammer, but due to the cluttered condition of the rest of the platform, he felt he was in "more or less" a safe position to lift. Printed Record at 161a. Mr. Richards continued to work after hurting his back, although he testified that he felt considerable pain. He reported the injury to his foreman. Mr. Richards was off work for a few days, and then returned to work only to reinjure his back on June 23, 1972.

On that occasion, appellee and another co-worker were ordered to repair a portion of the dredge's "dump pan." To do so, they were directed to use a piece of three-quarter inch steel plate, twenty-one by fifty-two inches in size, weighing approximately 400 pounds. The plate was lowered into position through the use of a hoist. In the process, the steel plate became lodged several times due to the cramped working conditions. To dislodge the plate, appellant was required to wrestle the sheet loose, consequently reinjuring

his back. There was testimony that in making similar repairs, since Mr. Richard's injury, the workers have been directed to use a lighter gauge of steel, and instead of using one large sheet, to use two pieces of steel, then weld them together once in place.

It was appellee's contention below, supported by medical opinion, that the episodes heretofore described caused appellee's injuries.

■■ Appellant argues that the portion of the charge reproduced earlier, particularly the underlined portions, incorrectly stated the law concerning appellant's duty. We do not agree. The shipowner is not an insurer of the safety of the ship's seamen, however, seamen have long been considered "wards of the court," and it is clear that the duty owed them reaches a high standard. This duty includes providing a reasonably safe place to work, and a reasonably safe method to do the work. *See* Gilmore & Black, The Law of Admiralty, § 6–34 *et seq.* (1957). Compared to the duty owed him, the seaman's duty is slight: "His [the seaman's] duty is to do the work assigned, not to find the safest method of work." *Spinks v. Chevron Oil Company,* 507 F.2d 216, 223 (5th Cir. 1975).

Appellant also contends that the trial judge erred in giving the following "safer method" charge to the jury:

"You may find the Defendant liable to the Plaintiff if you find there was a safer method to repair the harp that was talked about than the method used; and if the safer method were used, he would not have been injured." Printed Record at 357a.

■ We agree with appellant that standing alone, the above-quoted portion of the charge is incorrect. A shipowner is not under a duty to supply the very best tools or the very best method to accomplish a particular task. He need only supply a *reasonably* safe method or tool. *See e.g. Doucette v. Vincent,* 194 F.2d 834 (1st Cir. 1952). We cannot focus solely on the above portion of the charge, however, since it is axiomatic that in viewing the jury instructions, we will look to the charge in its entirety. The trial judge

expressly stated on numerous occasions throughout the charge that the test was one of *reasonableness. See* Printed Record at 321a, 327a, 356a. It is also clear that in determining whether or not a reasonable method was used, a proper element for the jury to consider was whether or not a safer alternative method was available and known to appellant. In view of these considerations, we find that the "safer method" charge did not constitute reversible error.

Appellant's further contention that the safer method charge had no basis in the evidence is also without merit. As discussed earlier, there was testimony concerning the unusually cluttered condition of the work platform and that this condition existed because one of the dredge's hoists was inoperable. Despite the workers' complaints, the platform was constantly covered with oil and gravel. In addition, the evidence showed that the incident occurred at night, and that several of the work lights were burned out. As to appellee's second injury, appellee was required to "manhandle" a large piece of steel in an extremely cramped area. There was also testimony that similar repairs are now being made with less cumbersome pieces of steel which can be welded together once they are in place. It is clear that there was sufficient evidence from which the jury could find, as they apparently did, that the conditions under which appellee was ordered to perform his assignments were unreasonably dangerous.

Appellant further argues that the charge on causation was improper. In particular, appellant excepts to the trial judge's statement that "If there were a number of causes of injury to the Plaintiff, that is irrelevant as long as you determine there is one cause which may be attributable to the Defendant's negligence." Printed Record at 357a. Appellant contends that this charge permitted and in fact invited the jury to engage in surmise and conjecture. We cannot agree. Unlike appellant, we do not believe that the charge allowed the jury to find appellant liable if its negligence "might" have caused appellee's injuries. Earlier in the charge, the trial judge erroneously instructed that appellant's negligence must have been the "proximate cause" of

appellee's injuries, in order for appellant to be liable. As has been pointed out, this is not the applicable test for causation. The proper test under the Jones Act is whether the employer's negligence played *any part* in causing the injury. *Heater v. Chesapeake and Ohio Railway Company,* supra. Thus the proximate cause charge was highly prejudicial, but in appellant's favor. The complained of portion of the charge was an attempt to remedy this earlier error. Appellant argues that the language "may be attributable to the Defendant's negligence," is equivalent to telling the jury they could hold Dravo liable if Dravo's negligence "might" have caused Mr. Richard's injuries. Perhaps the particular sentence could have been more clearly worded. Nonetheless, we do not equate "may be" to mean "might be," especially in view of the fact that the jury was told numerous times that to find liability, they must find that Dravo's negligence *did cause*, at least in part, appellee's injuries. As used in the above sentence may has the meaning of can. We find no reversible error in the trial court's charge.

Appellant's next contention is that the trial judge improperly molded the verdicts returned by the jury. The circumstances which gave rise to this claim may be summarized as follows:

The jury was asked to reach three verdicts. One verdict was sought in appellee's damage action, to be reduced by the degree of his contributory negligence, if any, as is the proper procedure under the Jones Act. The second verdict was to represent appellant's counterclaim, representing amounts already paid appellee, which figure was stipulated to at trial. Third, the jury was asked to return a verdict for the appellee if they found that any portion of appellant's maintenance and cure obligation had not been paid. Unfortunately, the jury apparently became confused in the attempt to fill in the verdict slips provided.

On the slip representing plaintiff-appellee's action against appellant, the foreman wrote "in favor of the plaintiff Norman Richards the amount of $72,000." Printed Record at 391a. In the upper left-hand corner of the slip was

written "$12,000 for cure and maintenance." On the slip representing appellant Dravo versus appellee Richards, the jury wrote, Verdict "on Counterclaim," . . . "Norman Richards the defendant liable to contributory negligence in the amount of $12,000." Printed Record at 390a. The verdicts as returned were not in compliance with the court's instructions. After much haggling between opposing counsel, the trial judge gave additional instructions on how the verdict slips should be filled out. The jury retired once again. When they returned, the only item changed was the $12,000 for maintenance and cure, which was changed to $8,000 for maintenance and cure. Printed Record at 391a. As the court was preparing to send the jury out again, with new verdict slips, Juror number 8 spoke up to say that the jury knew what they had decided, but just couldn't fill out the verdict slips in a way satisfactory to the legal minds involved. Printed Record at 385a. The jury foreman also maintained that all that was left to be done was write the verdicts down properly. Printed Record at 386a.

The trial judge, being careful not to usurp the jury's function, asked the members of the jury certain questions. Their answers revealed that Norman Richards' damages were found to be $72,000, and that such amount should be reduced by $12,000 due to appellee's contributory negligence. This seemed rather obviously to be the jury's intention, despite the fact that they had written the contributory negligence figure on the wrong slip. It was not so obvious however, what was intended by the maintenance and cure figure, entered once as $12,000 and another time as $8,000. During the course of the trial court's inquiry the jury expressed its intention that these figures represent the amount already paid by Dravo pursuant to the maintenance and cure obligation. This amount had been stipulated to be $10,763.29, but no copy of the stipulation went out with the jury, and they had been unable to recall the exact amount. The jury unanimously agreed that their intention was to award the stipulated amount to Dravo on the counterclaim, and to reduce the award of $72,000 to Richards by $12,000, representing his comparative negligence. Printed Record at

387a–388a. The trial judge then ordered the verdicts molded in that fashion.

The power of a trial judge to exercise his discretion in molding a verdict to fit the expressed desires of the jury is a cornerstone of the jury system. *See e.g. Wadatz v. Taormina*, 356 Pa. 481, 52 A.2d 220 (1947). In so exercising this discretion, however, the trial judge must tread with caution so as to avoid invading the province of the jury. *May v. Pittsburgh Railways Co.*, 209 Pa.Super. 126, 224 A.2d 770 (1966). A review of the record has led us to the conclusion that although the jury was confused as to the mechanics of returning their verdict, their intentions were clearly expressed on the record. Thus we find no abuse of discretion by the trial judge in ordering the verdicts molded to fit those expressed intentions.

Appellant's final arguments are that the verdict was against the weight of the evidence and that the verdict was excessive. We must reject both arguments. In regards to the weight of the evidence argument, appellant contends that the testimony of one of appellee's treating physicians, Dr. Waggoner, was inconsistent with the theory of recovery. According to Dr. Waggoner's testimony, he had treated Mr. Richards *prior* to the date on which appellee allegedly injured himself. The testimony of the other treating physicians, of appellee's co-workers, and appellee himself, was more than sufficient to permit the jury to resolve any inconsistency as to the treatment dates.

We likewise are unconvinced that a verdict of $60,000 in favor of appellee was excessive. By the time of trial, medical expenses and lost wages totalled over $10,000. Appellee underwent a laminectomy for the rescission of a herniated disk. Since the operation, he has experienced considerable pain and suffered deterioration of the lower vertabrae. He has undergone back manipulation, a procedure requiring administration of a general anesthetic. He must wear a back support. Mr. Richards has lost flexibility in his back, and the prognosis for recovery at time of trial was unfavorable. When injured, Mr. Richards was 47 years old, a man

with a ninth-grade education who had spent most of his working life in jobs involving labor and heavy lifting. We need cite no cases to say that the verdict herein was not excessive compensation for appellee's medical expenses, impairment of ability to support his family, inconvenience of wearing a back brace, and the pain and suffering endured and likely to be endured in the future.

Judgment affirmed.

PRICE, J., files a dissenting opinion.

PRICE, Judge, dissenting:

My reading of the record convinces me that the jury was hopelessly confused, and that the confusion was compounded by the lower court's attempt to mold the verdict. I, therefore, dissent for where the jury's intention is not clear a new trial must be awarded.

I express no opinion on the correctness of the charge.

I would award a new trial.